**J. H. HILL, Plaintiff in Error,**

v.

**The STATE of Oklahoma, Defendant in Error.**

**No. A–12242.**

Criminal Court of Appeals of Oklahoma.
March 7, 1956.

Mike Foster, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., J. Walker Field, Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

J. H. Hill, plaintiff in error, hereinafter referred to as defendant, was charged by information filed in the court of common pleas of Oklahoma County with the offense of failing to return license plate and certificate of title to the Oklahoma Tax Commission for cancellation. He was tried before a jury and convicted, but the jury being unable to agree upon the punishment to be assessed, the same was left to the court, who assessed a fine of $100, that being the maximum punishment under the terms of the statute, which provides for a fine of from $10 to $100. 47 O.S.1951 § 22.23(*l*). Appeal has been duly perfected to this court.

The charging part of the information reads:

"That is to say, the said defendant, in the county and state aforesaid, then and there being, did then and there wilfully, wrongfully, unlawfully and knowingly fail to surrender to the Oklahoma Tax Commission license plate and certificate of title No. B864006A, when said motor vehicle had been dismantled by the defendant, contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the State of Oklahoma."

The statutory provision forming the basis for the prosecution reads, 47 O.S. 1951 § 22.19:

"Every junk dealer engaged in the business of purchasing vehicles for junk or for the benefit of the material therein contained, upon the dismantling of any vehicle, or any other person permanently dismantling or junking a vehicle is hereby required to detach the license plates from such vehicle and return the same and the certificate of title to the [Oklahoma Tax] Commission for cancellation, together with a signed statement containing such information as the Commission may require."

We have carefully read the exhaustive briefs of both the defendant and the State, and have carefully read and studied the entire record made in the trial court, and are not going to extend this opinion into long dissertations covering the many points raised, this being a misdemeanor case. See Chapter 15, Senate Bill 450, § 2, amending 20 O.S.1951 § 47.

Suffice to say the State introduced evidence of two police officers of the Oklahoma City police department and the evidence of George Harrison, agent of the Oklahoma Tax Commission. These officers were conducting a salvage yard investigation throughout Oklahoma City, as well as in cooperation with the Oklahoma County Sheriff's office, of the Oklahoma County area.

Officer Rusche testified that prior to the arrest of the defendant on March 10, 1955 he had notified the defendant that he was going to have to keep records on his dealings in used cars that he scrapped; that two trips were made to the yard before the defendant was arrested. The day of the ar-

rest the officers found in defendant's junk yard a number of automobile frames and a motor block to a 1941 Chevrolet coupe. They asked the defendant if he had title to the car that he had junked, and he said he did, and went to his home and got the title which was introduced in evidence. It was dated February 16, 1955, and issued to one Rex Angel of Clinton, Oklahoma, tag No. 30-3301, covering Chevrolet coupe, motor No. AA-575874. It was endorsed in blank, purportedly by Rex Angel, without any date, and was not subscribed before a notary public.

The officers found the motor block to have the numbers on it obliterated. Defendant denied knowing this. Officer Rusche stated that defendant said he had cut up the Chevrolet for scrap. He said that when he asked defendant for the tag off of the Chevrolet, that defendant said that he believed he had seen it on another car on the lot, a '41 DeSoto Club coupe. The officers looked around and could not find the tag and never did find it. Officer Rusche said that they arrested defendant and later he and another officer by the name of Moncrief asked defendant about the operation of the business there, and he said: "Well, I would rather pay two or three fines a year than to have to keep records on those cars that I buy there just to scrap." Defendant's place was apparently half a block long and seventy-five feet wide, according to officer Rusche. There was stacked on it metal, cans, barrels, rags, and miscellaneous items, and he was operating under a salvage license.

On cross-examination of officer Rusche by counsel for defendant, he testified: "He [defendant] said that he salvaged out approximately one or two cars a week for junk purposes, out at his yard, his place of business, the day that we walked up out there and started to check his place of business. He said that he junked out about one or two cars a week just for scrap." Witness further stated that the first time they visited the defendant and warned him was in February, 1955.

The evidence of the agent of the Tax Commission, Harrison, was substantially as that of officer Rusche. In addition he said:

"Yes. I talked with Mr. Hill. My particular interest was his license to operate the salvage yard, and at that time he didn't have a license. He didn't have one. I also asked him about his records, about what kind of records he kept. * * * He didn't like to fool with books and keeping records."

Police officer S. W. Stephens testified that he was engaged in the accident division of the Oklahoma City police department, assigned to "hit and run" investigations, and that some time prior to the trial he had been called on to investigate a car accident in the unit block on Pennsylvania Avenue in which a 1941 DeSoto coupe was involved. That the DeSoto was being driven by one Ben Willie Allstat, and that it had a 1955 Oklahoma tag on it, number "30-3301" and that he ascertained that Allstat worked for the defendant Hill, and Allstat claimed that he had purchased the DeSoto from Mr. Hill.

The court overruled the demurrer interposed by the defense to the State's evidence.

The defendant Hill testified and said that he was in the business of junk dealer and had been for 24 years; that his business was principally buying and selling scrap. He denied that he had ever engaged in tearing down automobiles and junking them. He claimed that he purchased parts of automobiles that had already been junked.

As to the Chevrolet coupe, he admitted that he had junked it and had never turned in the license tag. He said that the body was "slick" and that he purchased the car from a boy who claimed that he was from Weatherford; that he purchased this car in question with the expectation of repairing it and letting his daughter have it; that he thereafter got an appraisal from an auto shop on repairing it and decided it would be too high if he had it repaired, so he just decided to scrap it. He had his men scrap the car, and then later he said that he discovered the tag was gone. This was the time the officers came to his place to arrest Ben Allstat for being in a car wreck.

Defendant's counsel asked:

"Q. Well, were you planning to try to send in this certificate or tag? A. Well, Mike, after them officers come out there, I definitely would have. I

never knew before. I thought a certificate of title made me legal owner to an automobile and I might do as I pleased with it, but after I went out and got the instructions, the State Tax Commission, I would have sent it out there. Nothing else to do. I would have sent it out there if I could have. I didn't have anything to send. The officers, they come out and picked up the title. Asked me if I had it and I said yes. Said, 'Give it here', and I did. I never seen it until this morning. I never could get hold of the tag. The danged old motor, I never noticed it didn't have no numbers on it. I couldn't go out there and turn in nothin'. I didn't remember the tag number. I didn't remember nothin'. I—I couldn't—I didn't remember none of that stuff. No way for me to check. The motor was—block assembly had been put in the car without a number. I never noticed it when I bought it, but it was a smooth block and I didn't have no opportunity. No way for me to have carried that tag out there. I would have just went out there blank if I had went out."

Defendant said that after the officers came to see him that he went out to the Tax Commission and they gave him a book of instructions to go by. He said that Mr. Bunnell who issued him a salvage dealer's license, told him that he ought to turn in titles covering cars he would junk and the tags taken off them in not longer than thirty days after acquiring title and junking them. He said that his book of instructions did not say when to turn in the titles and tags. He denied that he told the officers that he salvaged cars.

Herman Weinert, who said he worked for the Auto Parts Machine Company, testified to looking over the Chevrolet in question for the defendant as to cost of repairing it; that his company did not do car repairing but just machine work, like grinding crank shafts, re-boring blocks, and so on. He made an estimate of the cost of repairing for Scott's Garage.

In rebuttal the State recalled George Harrison, who testified the defendant told him that he purchased the 1941 Chevrolet for salvage, junk. He said that the defendant purchased his salvage dealer's license on March 10, 1955.

We conclude that the court did not err in overruling the defendant's demurrer to the State's evidence, or the demurrer at the close of the case.

We have studied the instructions given, and defendant's requested instruction No. 2 that the court refused to give. This latter instruction was covered by the court's instruction No. 4 given.

No doubt the jury had doubt as to whether the defendant ever contemplated or intended turning in the automobile tag and the title, even prior to his employee putting the tag on a car the defendant had sold him. He admitted that he had seen the tag on a DeSoto somewhere on the yard, according to the testimony of officer Rusche, and by his own testimony the fact that the license was lost, he seemed to think, in effect, enabled him to wash his hands of the matter. He could have turned in the title promptly and made an affidavit showing the tag had been stolen, if such was a fact.

There is much merit in some of counsel's contentions as to admission of evidence concerning defendant's failure to keep proper records covering his junk business, which is a separate matter and requiring a different license than that of a salvage or junk operator who wrecks cars. The prosecution was apparently trying to show that from defendant's scheme of operating his business as a whole he never intended at inception to turn in the car tag or car title. And of course if the defendant told the officers that he junked about one or two cars a week, he certainly should have realized the necessity of knowing and complying with the law governing salvaging operations. There was a conflict in defendant's testimony and that of the officers. The errors apparent are not fundamental in nature and are harmless insofar as they affect the question of guilt or innocence. And as we have so often said, this court will not weigh the evidence to determine upon which side it preponderates, but will uphold the verdict of the jury upon controverted questions of fact where there is ample competent evidence to sustain the verdict, even though under the facts, jury

could have found otherwise. Stout v. State, 96 Okl.Cr. 88, 248 P.2d 1059, 251 P.2d 518; Holden v. State, Okl.Cr., 272 P.2d 575.

■ If the evidence justified this court in concluding that the failure by the defendant to turn in the tag and title to the Chevrolet coupe in question was by reason of negligence or ignorance of the law, we would feel inclined to modify the punishment assessed. Particularly so in view of the fact that the jury apparently could not agree upon assessing the maximum penalty because they left the punishment to be fixed by the court. But the record shows that defendant when testifying admitted that he had paid a fine in the city court in connection with failure to comply with some city ordinance covering the operation of his business, and we in this connection feel justified in taking judicial knowledge[1] of the fact that in the case of Hill v. State, 78 Okl.Cr. 384, 148 P. 2d 992, the defendant appealed from a conviction had in the district court of Oklahoma County for receiving stolen property, being six rolls of cyclone wire fence. The case was affirmed May 10, 1944, and there was a six months jail sentence attached, but for some strange reason[2] the mandate of this court was not carried out for several years, and then when the delayed execution of the mandate was attempted to be carried out, the defendant sought release by way of writ of habeas corpus, which this court denied on April 21, 1948. Ex parte Hill, 86 Okl.Cr. 318, 192 P.2d 849.

We conclude, therefore, that the judgment should be, and it is, affirmed, and without modification.

JONES, P. J., and BRETT, J., concur.

1. See Courtney v. State, 41 Okl.Cr. 30, 269 P. 1059; Coburn v. State, 78 Okl. Cr. 362, 148 P.2d 483; Ex parte Collins, 76 Okl.Cr. 163, 135 P.2d 61; Dunn v. State, Okl.Cr., 279 P.2d 389; Wallace v. State, 196 Ind. 509, 149 N.E. 57, 31 C.J.S., Evidence, § 50(c).

2. This was before the amendment of Tit. 22 O.S.1951 § 1072 by S.L.1953, p. 99, § 3, enacted to prevent such flagrant negligence, and which requires a return by the clerk of the court to which mandate is issued, to this court showing steps taken in execution of mandate. See also Chapter 18 O.S.A., Rule 18 of this Court.